**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASARCO, LLC,
              *Plaintiff-Appellant*,

v.

CELANESE CHEMICAL COMPANY,
              *Defendant-Appellee*.

No. 12-16832

D.C. No.
3:11-cv-01384-
WHA

OPINION

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted
October 8, 2014—San Francisco, California

Filed July 10, 2015

Before: William A. Fletcher and Paul J. Watford, Circuit
Judges, and Kevin Thomas Duffy, District Judge.[*]

Opinion by Judge Duffy

---

[*] The Honorable Kevin Thomas Duffy, United States District Judge for the Southern District of New York, sitting by designation.

**SUMMARY**[**]

---

### Environmental Law

Affirming the district court's summary judgment, the panel held that a claim for contribution under § 113(f)(3)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act was time-barred.

In 1989 plaintiff ASARCO, LLC, entered into a settlement agreement arising from a cost-recovery lawsuit under CERCLA § 107. During bankruptcy proceedings in 2008, ASARCO entered into a second settlement agreement arising from response cost claims asserted by the California Department of Toxic Substances Control. ASARCO filed its new contribution claim in 2011.

The panel held that the judicially approved settlement agreement between private parties to the cost-recovery suit started the clock on the three-year statute of limitations in CERCLA § 113(g)(3)(B) in 1989. The panel held that the later bankruptcy settlement with the government, fixing ASARCO's costs associated with the cost-recovery settlement agreement, did not revive a contribution claim that had otherwise expired.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Linda R. Larson (argued), Russell C. Prugh, and Meline G. MacCurdy, Marten Law PLLC, Seattle, Washington; Gregory Evans and James G. Warren, Integer Law Corporation, Los Angeles, California, for Plaintiff-Appellant.

John D. Edgcomb (argued) and Michael A.G. Einhorn, Edgcomb Law Group, P.C., San Francisco, California, for Defendant-Appellee.

**OPINION**

DUFFY, District Judge:

Plaintiff-Appellant ASARCO, LLC ("ASARCO") appeals the district court's grant of summary judgment in favor of Defendant-Appellee CNA Holdings, LLC[1] ("CNA") in ASARCO's suit for contribution under § 113(f)(3)(B) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9613(f)(3)(B).[2] The district court ruled that ASARCO's contribution action was time-barred and dismissed the complaint. For the reasons that follow, we affirm the judgment of the district court.

---

[1] Erroneously named in the suit as Celanese Chemical Company.

[2] ASARCO's appeal as to Union Pacific Railroad Company and Union Pacific Corporation was voluntarily dismissed with prejudice on February 15, 2013, pursuant to Federal Rule of Appellate Procedure 42(b), so CNA is the only remaining appellee in this case.

## *FACTS AND PROCEDURAL HISTORY*

ASARCO is the corporate successor to a company that owned and operated a silver and lead smelter on a 66-acre industrial site (the "Selby Site") on San Pablo Bay in Contra Costa, California.  The smelter operated until 1970, depositing smelting byproducts on its property and the tideland ASARCO leased from the California State Lands Commission ("State Lands") abutting the property.  The smelter was closed after it was named as the likely source of lead pollution that caused livestock deaths nearby.  After the smelter closed, ASARCO leased a 1.33 acre parcel of the Selby Site containing a sulfur dioxide plant ("Plant") that ASARCO had previously operated to Virginia Chemicals, a corporate predecessor to CNA.  CNA leased and operated the Plant from 1972 until September 1977.  As a result of the Plant operations that occurred before and during CNA's leasehold, the soil in the Selby Site area was contaminated with sulfuric acid, as discovered by the San Francisco Bay Regional Water Quality Control Board (the "RWQCB") in April 1976.  RWQCB issued a cleanup and abatement order in August 1976, amended the order in November 1976, and conditionally rescinded the order in April 1977.

After the Plant shut down, and long after smelting had ceased, Wickland Oil Company ("Wickland") purchased ASARCO's Selby Site property in October 1977, and leased the tidelands from State Lands in July 1981 to build and operate a marine fuel terminal.  Wickland learned from the California State Department of Health Services ("California DHS") that the Selby Site contained hazardous substances, and that further investigation and remediation efforts were required across much of the site.  California DHS had identified the presence of toxic metals in the slag pile, with

high concentrations of lead, zinc, arsenic, and cadmium. The Selby Site was placed on the California State Superfund list. Wickland incurred environmental response costs and looked for other responsible parties to share those costs.

In 1983, Wickland filed a cost-recovery lawsuit under CERCLA § 107 against ASARCO, as the former owner of part of the Selby Site and operator of the entire Selby Site, and State Lands, as the former owner of the remainder of the Selby Site that permitted and encouraged the disposal by ASARCO of hazardous substances on the Selby Site. In its lawsuit, Wickland sought to establish ASARCO's liability for response costs at the Selby Site to address metals leaching from the slag and causing groundwater contamination. Wickland sought reimbursement of no less than $400,000 in past response costs and a declaration that ASARCO and State Lands were liable for all future response costs at the Selby Site. After the district court rendered summary judgment in favor of ASARCO and State Lands in the 1983 case on the grounds that (1) the cost recovery claim was not ripe and (2) the claims for declarative and therefore injunctive relief were not ripe, we reversed the district court's judgment and remanded the case so that Wickland could pursue its claims. *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887, 892–93 (9th Cir. 1986).

In February 1989, Wickland, ASARCO, and State Lands (collectively, the "Settling Parties") entered into the Wickland Agreement, an "Agreement for Entry of Consent Judgment" to "settle and compromise the [district court lawsuit], and to establish a procedure for allocating past and future costs attributable to the events and conditions underlying the [district court lawsuit]." State Lands entered into the agreement as the former owner of part of the Selby

Site, not as a "Government Agency." Although the Settling Parties knew that Virginia Chemicals had been named in the 1976 RWQCB Order and repeatedly referred to in the Wickland lawsuit, Virginia Chemicals had never been brought into the lawsuit as a party, and was not a party to the Wickland Agreement. The district court entered a consent judgment based on the Wickland Agreement on March 13, 1989, and retained jurisdiction over the parties in order to enforce or amend the terms of the Agreement.

In August 2005, sixteen years after the Wickland Agreement settled the Selby Site litigation, ASARCO filed a Chapter 11 voluntary petition in the United States Bankruptcy Court for the Southern District of Texas. State Lands, C.S. Land, Inc. ("CSLI," Wickland's successor in interest), and California Department of Toxic Substances Control ("DTSC," California DHS's successor as the administrating regulatory agency) asserted claims for ASARCO's share of past and future Selby Site environmental costs in July 2006 (and amended the claims in 2007). DTSC's proof of claim indicated that remediation of the conditions addressed by ASARCO's interim remedial measures was not complete and sought to recover costs to implement a final remedy at the Selby Site.

In January 2008, ASARCO moved in the bankruptcy court for approval of a settlement ("2008 Bankruptcy Settlement") of the response cost claims asserted by State Lands, CSLI and DTSC. Notably, ASARCO's parent company filed an objection to the settlement, contending that the settlement included costs to remediate contaminated groundwater that ASARCO had nothing to do with. ASARCO's parent withdrew the objection after negotiating a stipulation and clarification with the parties regarding $33

million ASARCO was to pay DTSC under the 2008 Bankruptcy Settlement. The bankruptcy court approved the 2008 Bankruptcy Settlement on March 31, 2008.

On March 23, 2011, ASARCO filed a new lawsuit against CNA to seek contribution under CERCLA § 113(f). CNA moved for summary judgment on the ground that ASARCO's suit was barred by the statute of limitations under CERCLA § 113(g)(3)(B), and on June 6, 2012, the district court entered summary judgment in favor of CNA. The district court decided that the statute of limitations for contribution claims following a "judicially approved settlement" under CERCLA § 113(g)(3)(B) applied to any judicially approved settlement, whether between private parties or between a private party and the United States or a State. The district court determined that the statute of limitations applied to the Wickland Agreement and that ASARCO's time to file a contribution claim pursuant to the Wickland Agreement had expired. The district court also determined that 2008 Bankruptcy Settlement did not present any new costs not contemplated in the Wickland Agreement, and therefore a new contribution claim had not accrued as a result of the 2008 Bankruptcy Settlement. This appeal followed.

## STANDARD OF REVIEW

Summary judgment in CERCLA cases is reviewed de novo. *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 870 (9th Cir. 2001) (en banc). The district court's interpretation of CERCLA is reviewed de novo. *City of Emeryville v. Robinson*, 621 F.3d 1251, 1261 (9th Cir. 2010). "Interpretation of a settlement agreement is a question of law subject to de novo review, but we defer to any factual findings made by the district court in interpreting the

settlement agreement unless they are clearly erroneous." *Id*. (internal citation omitted).

## *DISCUSSION*

### I. Introduction

The issues before us hinge on a question of statutory interpretation: Under CERCLA, may a settlement agreement between private parties to a CERCLA § 107 cost-recovery lawsuit create a cause of action for contribution under CERCLA § 113(f)(1) that is excepted from the three-year statute of limitations in CERCLA § 113(g)(3)? As we have previously noted, CERCLA is a complex statute with a "'maze-'like structure and 'baffling language.'" *California ex rel. Cal. Dep't of Toxic Substances Control v. Neville Chem. Co.*, 358 F.3d 661, 663 (9th Cir. 2004) (quoting *Carson Harbor Vill.*, 270 F.3d at 880, 883). While the statutory language may be baffling and the structure maze-like, the statute clearly indicates that *any* contribution claim for particular remedial costs is subject to a three-year statute of limitations once liability for a potentially responsible party ("PRP") becomes recognized through a judicially approved settlement. 42 U.S.C. § 9613(g)(3)(B).

At oral argument in this case, ASARCO admitted that it could have filed a contribution claim against CNA following the entry of the Wickland Agreement. At issue in this appeal is (1) whether or not a CERCLA contribution claim, once it has accrued, may be excepted from the statute of limitations based on the type of settlement that underlies the claim, and (2) if the claim is subject to the statute of limitations and the time to file has expired, whether the claim may be revived by a subsequent event. We hold that a judicially approved

settlement agreement between private parties to a CERCLA cost-recovery suit starts the clock on the three-year statute of limitations in CERCLA § 113(g)(3)(B), and that a later bankruptcy settlement that fixes the costs of such a cost-recovery settlement agreement does not revive a contribution claim that has otherwise expired.  Our holding that a later bankruptcy settlement with the government cannot revive an otherwise expired contribution claim ensures that a party does not receive a benefit that it had not paid for in the bankruptcy settlement.

## II. ASARCO's Time to File Contribution Claims Pursuant to the Wickland Agreement Has Expired.

CERCLA § 113(f)(1) creates the right of contribution for private parties that are liable or potentially liable under CERCLA, during or following certain CERCLA civil actions. *Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004).  Contribution rights for one PRP against another PRP only accrue if the first PRP is already involved in a lawsuit under CERCLA § 106 (for federally-required abatement action response costs) or CERCLA § 107(a) (for clean-up cost recovery by the government or a private party).  *Id.* Otherwise, such a claim for contribution between PRPs would be properly stated through a CERCLA § 107(a) cost recovery suit, assuming that the plaintiff PRP has incurred its own cleanup costs.  *Kotrous v. Goss-Jewett Co. of N. Cal.*, 523 F.3d 924, 934 (9th Cir. 2008); *accord United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007).   Once Wickland sued ASARCO for CERCLA § 107 cost recovery in 1983, ASARCO could have filed a contribution claim against CNA's corporate predecessor, Virginia Chemicals. *See* 42 U.S.C. § 9613(f)(1).  ASARCO conceded as much at oral argument in this case when ASARCO recognized that it

could have pursued a contribution claim following the entry of the Wickland Agreement in 1989.  As discussed in the following subsection B, ASARCO's right to pursue its contribution claim against CNA for the Selby Site remediation expired when the statute of limitations in CERCLA § 113(g)(3) ran out in 1992.

### A.  Contribution Claims Are Subject to a Three Year Statute of Limitations.

CERCLA § 113

> provides two express avenues for contribution: § 113(f)(1) ("during or following" specified civil actions) and § 113(f)(3)(B) (after an administrative or judicially approved settlement that resolves liability to the United States or a State). Section 113(g)(3) then provides two corresponding 3-year limitations periods for contribution actions, one beginning at the date of judgment, § 113(g)(3)(A), and one beginning at the date of settlement, § 113(g)(3)(B). . . . [T]o assert a contribution claim under § 113(f), a party must satisfy the conditions of either § 113(f)(1) or § 113(f)(3)(B).

*Cooper Indus.*, 543 U.S. at 167.  Thus, one "avenue" to a contribution claim accrues once a polluter sues or is sued under CERCLA §§ 106 or 107, and that avenue remains open while the lawsuit is unresolved.  42 U.S.C. § 9613(f)(1).  Then the statute of limitations begins to run once that litigation settles or ends by judgment.  *See id*.; *see also id.*

§ 9613(g)(3). The other "avenue" to a contribution claim accrues when a person has "resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement." *Id.* § 9613(f)(3)(B).

ASARCO contends that the special rights conferred by CERCLA § 113(f)(2)–(3) on persons that settle liability or costs with the government suggest, when read in conjunction with the rest of the statute, that private-party settlements may not activate the statute of limitations for contribution claims. But that is not what the plain language of the statute suggests. In order for a contribution claim to accrue, one of two necessary conditions must occur: (1) a lawsuit under either CERCLA §§ 106 or 107, or (2) a judicially approved settlement with the United States or a State. 42 U.S.C. § 9613(f)(1) & (f)(3)(B); *see also Cooper Indus.*, 543 U.S. at 166 ("There is no reason why Congress would bother to specify conditions under which a person may bring a contribution claim, and at the same time allow contribution actions absent those conditions."). The lack of any specified statute of limitations for a contribution claim pled in the absence of either of the two necessary conditions—as would be the case for a contribution claim pled as a result of a "purely voluntary cleanup"—means that a claim absent either of the two necessary conditions is unavailable. *Cooper Indus.*, 543 U.S. at 167. It follows, then, that any contribution claim is subject to the three-year statute of limitations. *See id.*

### B.  The Wickland Agreement Triggered the Statute of Limitations of § 9613(g)(3)(B).

The statute of limitations for a contribution claim is triggered by the date upon which the judgment or settlement that underlies the claim is entered.  *See id*.  When the CERCLA §§ 106 or 107 lawsuit is over and a judgment is entered, the statute of limitations begins to run on the cause of action for contribution that accrued during the pendency of that litigation.  *See* 42 U.S.C. § 9613(g)(3)(A).  When a person resolves its liability to the United States or a State through an administrative or judicially approved settlement, a right to assert a contribution claim against other PRPs also accrues.  *Id.* § 9613(f)(3)(B).  Such a settlement starts the clock on the three-year statute of limitations for the contribution claim that accrues on the basis of that settlement.  *Id.* § 9613(g)(3)(B).  ASARCO argues that only judicially approved settlements involving the United States or a State may trigger the statute of limitations under § 9613(g)(3)(B), and that private-party judicially approved settlements cannot trigger the § 9613(g)(3)(B) statute of limitations.  We hold that private-party judicially approved settlements may trigger the § 9613(g)(3)(B) statute of limitations.

"Statutes of limitations are intended to provide notice to defendants of a claim before the underlying evidence becomes stale."  *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986, 1009 (9th Cir. 2008).  A primary canon of statutory interpretation is that the plain language of a statute should be enforced according to its terms, in light of its context.  *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *Wilshire Westwood Assocs. v. Atl. Richfield Corp.*, 881 F.2d 801, 803 (9th Cir. 1989).

> When interpreting a statute, our task is to construe what Congress has enacted. We look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. We will resort to legislative history, even where the plain language is unambiguous, where the legislative history clearly indicates that Congress meant something other than what it said.

*Carson Harbor Vill.*, 270 F.3d at 877 (internal quotation marks and citations omitted). "Thus, we examine the statute as a whole, including its purpose and various provisions." *Id.* at 880. We construe the statute in context to avoid superfluities. *Cooper Indus.*, 543 U.S. at 166 (citing *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). If possible, we "construe a statute to give every word some operative effect." *Id.* at 167 (citing *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 35–36 (1992)). "Clearly, neither a logician nor a grammarian will find comfort in the world of CERCLA. It is not our task, however, to clean up the baffling language Congress gave us . . . ." *Carson Harbor Vill.*, 270 F.3d at 883.

Here, ASARCO suggests that we read into the statutory language a requirement that a judicially approved settlement include the United States or a State in order to trigger the statute of limitations at § 9613(g)(3)(B), just as the settlement bar at § 9613(f)(2) and the accrual of contribution rights under § 9613(f)(3)(B) each require that a judicially approved settlement include the United States or a State as a party. First, the plain language of the statute of limitations does not limit triggering "judicially approved settlements" to those

involving the United States or a State.  *See* 42 U.S.C. § 9613(g)(3)(B).  The triggering event for that statute of limitations at § 9613(g)(3)(B) includes judicially approved settlements involving the United States or a State, but is not limited to those types of settlements on its face.  We are wary of reading such an additional condition into this statute of limitations.  *See City of Colton v. Am. Promotional Events, Inc.-W.*, 614 F.3d 998, 1007 (9th Cir. 2010) (quoting *Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11, 19–20 (1979)).

Second, our reading does not result in superfluity.  The provisions cited by ASARCO in support of its position are distinct in that they confer certain rights upon parties that settle their liability with the government.  These rights may encourage parties to settle with the government at an early stage, thus facilitating the cleanup efforts that CERCLA was designed to promote.  *See Carson Harbor Vill.*, 270 F.3d at 884.  Judicially approved settlements that do not include the United States or a State do not confer such settlement protection.   Whether or not a private party "judicially approved settlement" is also a "judgment" that would trigger the statute of limitations at § 9613(g)(3)(A) does not necessarily render the provision superfluous.  *See id.* at 881–82 (substantial overlap in definitions does not render terms superfluous).

Third, interpreting the statute of limitations at § 9613(g)(3)(B) to include a trigger for private-party judicially approved settlements ensures that every word has operative effect.  To do otherwise would confer a right of contribution following private-party judicially approved settlements that would never expire.  ASARCO recognized that it could have filed a claim for contribution following the

entry of the Wickland Agreement.  Exempting these contribution claims from the statute of limitations would subject PRPs to litigation at any time following a private party settlement, and encourage private parties to settle with each other, rather than with the government, rendering the statute of limitations for contribution actions meaningless.[3]

## III.    The Wickland Agreement Covered All Response Costs at the Selby Site and the 2008 Bankruptcy Settlement Merely Fixed Costs.

### A.  The Scope of the Wickland Agreement

The 1989 Consent Judgment and Wickland Agreement ended the litigation related to the Selby Site, after the appeal in *Wickland Oil Terminals v. Asarco, Inc.*, 792 F.2d 887 (9th Cir. 1986).  As discussed earlier, Wickland was permitted to pursue its CERCLA cost recovery claims against ASARCO after we reversed the district court's dismissal.  In order to determine what the Wickland Agreement covered, we interpret de novo the settlement agreement.  *City of Emeryville*, 621 F.3d at 1261.

Under California law, "the mutual intention of the parties at the time the contract is formed governs interpretation." *AIU Ins. Co. v. Super. Ct.*, 799 P.2d 1253, 1264 (Cal. 1990) (citing Cal. Civ. Code § 1636).  The intent of the parties is

---

[3] ASARCO also argues that the Wickland Agreement did not meet the standard for a judicially approved settlement.  ASARCO cannot now argue that the court was wrong to approve the Wickland Agreement as part of the consent judgment 25 years after ASARCO participated in the agreement and accepted the consent judgment.  The district court did not abuse its discretion decades ago in approving the agreement.

determined "solely from the written provisions of the contract." *Id.* (citing Cal. Civ. Code § 1639). The ordinary meaning of a contract's terms controls judicial interpretation. *Id.*; *see also* Cal. Civ. Code § 1644. No matter how broad a contract may appear, "it extends only to those things concerning which it appears that the parties intended to contract." Cal. Civ. Code § 1648.

In this case, the provisions of the contract are clear.[4] The Wickland Agreement settled the dispute between ASARCO and Wickland over the Selby Site. In the Wickland Agreement, the parties undertook to "establish a procedure for allocating past and future costs attributable to the events and conditions underlying the [district court case]." The events and conditions underlying the district court case were the industrial operations and resulting pollution that had occurred at the Selby Site prior to Wickland's ownership. *See Wickland Oil Terminals*, 792 F.2d at 889. The parties to the Wickland Agreement, Wickland, ASARCO, and State Lands, agreed to undertake site remediation to investigate, monitor, and abate actual or threatened contamination at the Selby Site, caused by or related to the conditions at the site addressed by the Remedial Action Plan.

---

[4] "The construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990). The Wickland Agreement expressly states that California law governs its terms, but the district court analyzed the Wickland Agreement by applying principles of federal common law. While the district court committed error by failing to explicitly apply California law, instead using a federal standard to interpret the Wickland Agreement, such error was harmless because both approaches yield the same result. *See Cachil Dehe Band of Wintun Indians v. California*, 618 F.3d 1066, 1073 (9th Cir. 2010).

The Remedial Action Plan was based on a report prepared by an environmental consultant and incorporated into the Wickland Agreement. The goals of the Remedial Action Plan were to dredge contaminated sediments in the tidelands to dispose of them, to remediate acid-affected soils in the Virginia Chemicals area, to cap the site to prevent runoff contamination, and to relocate a sewage oxidation pond. ASARCO, Wickland, and State Lands agreed to share the costs of implementing the initial part of this plan equally. To the extent that a government agency responsible for oversight of the cleanup effort ordered additional work, or the parties mutually agreed that additional work was required to accomplish the Remedial Action Plan, those costs would also be shared equally as a "Subsequent Modification." The parties decided that if a future cost was an "Other Remediation Cost" and not a "Subsequent Modification," that ASARCO would bear 42%, State Lands 38%, and Wickland 20% of the future cost. Costs envisioned were necessary and proper if the parties agreed to them, an arbitrator imposed them, or the government required them as part of a compliance order. The Wickland Agreement's Remedial Action Plan was developed with input and approval from California DHS and the RWQCB. The California DHS letter attached as part of the Wickland Agreement establishes an understanding between the agency and the parties that the parties would take over responsibility for the efforts that California DHS had already begun to remediate conditions at the Selby Site. The Wickland Agreement's tasks matched those already planned or started by California DHS.

The Remedial Action Plan included work in the Virginia Chemicals-leased area. Therefore, the clean-up work that underlies ASARCO's contribution claim against CNA was included in the Wickland Agreement. The Remedial Action

Plan does not distinguish between site conditions caused by Virginia Chemicals and those caused by ASARCO as a result of sulfur dioxide operations at the Plant. When read in total, it is evident from the terms of the Wickland Agreement that the agreement was meant to be a final determination of each agreeing party's liability for costs associated with cleaning up the Selby Site, in accordance with the oversight and requirements of California DHS.

ASARCO argues that the future work to be performed and associated costs were too uncertain under California law to be enforceable by contract. ASARCO cites *Robinson & Wilson, Inc. v. Stone*, 110 Cal. Rptr. 675, 682–84 (Cal. Ct. App. 1973), in support of that proposition, though that case is factually distinguishable. In *Robinson*, the contract calling for future work failed to provide sufficient clarity regarding the nature of the work or who would pay for it. *See id*. at 683. The terms of the Wickland Agreement clearly define who will pay for the work and the nature of the work to remediate the Selby Site, while contemplating that additional tasks may be added to accomplish the remediation's goals. Though the complete costs were unknown at the time that the Wickland Agreement was entered, ASARCO's contention that the uncertainty of *costs then* means that the Wickland Agreement could not have covered *costs now* mirrors ASARCO's contention against Wickland in the 1980s litigation.

We previously decided that "[t]he essential fact establishing Wickland's right to declaratory relief—the alleged disposal of hazardous substances at the Selby [Site] at the time [ASARCO] owned and operated the smelting facility—has already occurred." *Wickland Oil Terminals*, 792 F.2d at 893. The Wickland Agreement functions much

like a proportionate liability declaratory judgment would.[5] The fact that the full costs were unknown at the time does not mean that the Wickland Agreement was less than comprehensive.

## B. The 2008 Bankruptcy Settlement Fixed ASARCO's Costs Associated with the Wickland Agreement.

The 2008 Bankruptcy Settlement settled any claims that State Lands and CSLI had against ASARCO as a result of the Wickland Agreement. It also settled ASARCO's responsibility vis-a-vis DTSC (California DHS's successor) to clean up the Selby Site. The 2008 Bankruptcy Settlement refers to the Wickland Agreement, and states that DTSC required ASARCO, CSLI, and State Lands to conduct additional remediation at the site in order to achieve a "final remedy." CSLI's and State Lands' proofs of claim in the 2008 Bankruptcy Settlement all cite to the entry of the Wickland Agreement Consent Judgment on March 13, 1989, as the basis for their claims against ASARCO. DTSC's proof of claim cites January 1, 1983 as the date when ASARCO's obligations to DTSC began. In other words, the bankruptcy claims against ASARCO stem from ASARCO's liability to fund or perform cleanup efforts at the Selby Site, which, according to the terms of the Wickland Agreement, were divided among ASARCO, Wickland, and State Lands for past and future costs at the Selby Site. In an affidavit in support

---

[5] If ASARCO had filed a contribution claim against CNA after entering the Wickland Agreement, it could have sought a declaratory judgment for contribution costs. *See, e.g.*, *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1191 (9th Cir. 2000) (proportional declaratory judgment contribution claims allowed following private party CERCLA actions).

of the 2008 Bankruptcy Settlement, ASARCO contended that its fair share of any future work at the Selby Site would be 33%, in accordance with the terms of the Wickland Agreement (although the other Wickland Agreement parties maintained that ASARCO would be liable for 42%, citing a different provision of the Wickland Agreement), and the amount paid to DTSC reflected that liability. Therefore, the 2008 Settlement Agreement reflects an understanding of the parties to settle ASARCO's 1989 obligations under the Wickland Agreement. Also instructive is ASARCO's parent's objection to the terms of the 2008 Bankruptcy Settlement, withdrawn after clarification and a stipulation among the parties that the 2008 Bankruptcy Settlement did not go beyond ASARCO's responsibilities under the Wickland Agreement. While ASARCO's contention that there are items in DTSC's remedial action objectives that differ from the intermediate remedial measures in the Wickland Agreement is valid, those changes are the mandate of an overseeing government agency. The Wickland Agreement defines such mandated costs as "necessary and appropriate," and apportions that liability according to the intent of the parties. Therefore, the $33 million that ASARCO agreed to pay to DTSC in the 2008 Bankruptcy Settlement to satisfy ASARCO's obligations to clean up the Selby Site is not a new cost, and it cannot underlie a new claim for contribution.

ASARCO contends that the phrase "such costs or damages" in the statute of limitations means that ASARCO's claim for contribution only came about when "such costs or damages" became fixed. ASARCO cites to *American Cyanamid Co. v. Capuano*, 381 F.3d 6 (1st Cir. 2004), but that case held that a new claim for contribution based on new settlement liability (groundwater) cannot be barred by an

earlier settlement for a different contribution claim (soil). 381 F.3d at 25–26. ASARCO also cites to a Sixth Circuit case in an attempt to bolster the point that only costs fixed in a settlement are eligible in contribution. *See RSR Corp. v. Commercial Metals Co.*, 496 F.3d 552, 559 (6th Cir. 2007). But the Sixth Circuit found that the future costs sought in that action were imposed as part of a judicially approved settlement, and found that the statute of limitations had expired. *Id.* at 558. "Rather than focus on *who* settled the cost-recovery action, in short, the statute asks us to focus on *what* was settled." *Id.* at 557. In this appeal, ASARCO's new contribution claim via the 2008 Bankruptcy Settlement is for exactly the same liability ASARCO assumed in the 1989 Wickland Agreement, and is therefore time barred.

## IV.     The 2008 Bankruptcy Settlement Did Not Create a New Claim or Revive the Expired Claim.

ASARCO argues that even though it failed to pursue a CERCLA § 113(f)(1) claim during or following the litigation that led to the Wickland Agreement, it should nonetheless be permitted to pursue a contribution claim against CNA as a result of the 2008 Bankruptcy Settlement, pursuant to a right for contribution under CERCLA § 113(f)(3)(B). ASARCO argues that there is nothing in CERCLA that would bar it from seeking successive contribution from CNA now that ASARCO's costs of response and liability vis-a-vis the government are fixed in the 2008 Bankruptcy Settlement. ASARCO makes this argument two ways. First, ASARCO argues that the costs it seeks in this action related to the 2008 Bankruptcy Agreement are for final response costs not

contemplated in the Wickland Agreement.[6]     Second,
ASARCO argues that CERCLA § 113(f)(3)(B) creates a
separate and absolute right to seek contribution following
settlement with the government, even for the same costs
ASARCO could have sought contribution for following the
Wickland Agreement, but failed to seek before ASARCO was
time-barred.

ASARCO is correct that there is no limit in the statute to
prevent a party in an early settlement from seeking
contribution related to a later settlement, as long as those
settlements cover separate obligations. *See Am. Cyanamid*,
381 F.3d at 25–26. ASARCO is also correct that there is an
express right to seek contribution from other PRPs following
a settlement with the government, according to CERCLA
§ 113(f)(3)(B), and that the 2008 Bankruptcy Settlement
settled ASARCO's liability to the government for the first
time. We have not previously considered whether a settling
party has an absolute right to pursue an otherwise expired
claim following a settlement with the government, and we
hold that no such right exists. On this point, the First
Circuit's reasoning in *American Cyanamid* is helpful. The
First Circuit reasoned that allowing a previous settlement on
a discrete set of costs to trigger the statute of limitations on an
unresolved set of costs would unfairly reward an early settler
with a benefit that it had not paid for, and would allow that
settler to avoid paying its fair share. *Am. Cyanamid*, 381 F.3d
at 16. Additionally, if we adopted ASARCO's position,
allowing a bankruptcy settlement with the United States or a
State to revive an otherwise expired CERCLA claim would
circumvent the statute of limitations. "The principal purpose

---

[6] As addressed in Section III, above, the costs are the same, so ASARCO
cannot recover from CNA under this theory.

of limitations periods in this setting is to ensure that the responsible parties get to the bargaining—and clean-up—table sooner rather than later." *RSR Corp.*, 496 F.3d at 559. If the right to seek contribution on an otherwise expired claim was allowed after fixing costs with the government, then any PRP seeking to fix the costs of privately-apportioned CERCLA liability through a bankruptcy settlement with the government would receive a benefit that it had not paid for in that bankruptcy settlement. Such a right would circumvent the statute of limitations for contribution actions and would encourage tardy parties to use bankruptcy to revive their expired claims. It would also serve to discourage private party settlements and diligent pursuit of contribution claims following the entry of such settlements. If the principal purpose of the limitations period is to ensure that responsible parties get to the "bargaining and clean-up table" sooner rather than later, then potentially responsible parties must be brought to that table within three years of the statute-of-limitations triggering event, and once the statute of limitations has expired on that cause of action, potentially responsible parties cannot revive the expired contribution claim through a subsequent bankruptcy settlement with the United States or a State.

The judgment of the district court is **AFFIRMED.**