**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ARCONIC, INC., FKA Alcoa, Inc.;
APPLIED MICRO CIRCUITS CORP.;
BASF CORPORATION; BAXTER
HEALTHCARE CORPORATION; CAL-
TAPE & LABEL CO.; CALIFORNIA
HYDROFORMING COMPANY, INC.;
CINTAS CORPORATION; COLUMBIA
SHOWCASE & CABINET COMPANY,
INC.; COUNTY OF LOS ANGELES;
CROSBY & OVERTON, INC.; DISNEY
ENTERPRISES, INC.; FHL GROUP;
FORENCO, INC.; GENERAL DYNAMICS
CORPORATION; HEXCEL
CORPORATION; HERCULES, INC.;
HONEYWELL INTERNATIONAL, INC.;
INTERNATIONAL PAPER COMPANY;
LOS ANGELES COUNTY
METROPOLITAN TRANSPORTATION
AUTHORITY; MATTEL, INC.; MASCO
CORPORATION OF INDIANA; MERCK
SHARP & DOHME CORPORATION;
PILKINGTON GROUP LIMITED; QUEST
DIAGNOSTICS CLINICAL
LABORATORIES, INC.; RAYTHEON
COMPANY; SOCO WEST, INC.;
SPARTON TECHNOLOGY, INC.; THE
BOEING COMPANY; THE DOW
CHEMICAL COMPANY; REGENTS OF
THE UNIVERSITY OF CALIFORNIA;

No. 19-55181

D.C. No.
2:14-cv-06456-
GW-E

OPINION

TRIMAS CORPORATION; UNIVAR USA, INC.; SAFETY-KLEEN SYSTEMS, INC.,

*Plaintiffs-Appellants*,

v.

APC INVESTMENT CO.; ASSOCIATED PLATING COMPANY; ASSOCIATED PLATING COMPANY, INC.; GORDON E. MCCANN; LYNNEA R. MCCANN; DARRELL K. GOLNICK; CLARE S. GOLNICK; BODYCOTE THERMAL PROCESSING, INC.; POWERINE OIL COMPANY; CLAUDETTE EARL; EARL MFG. CO., INC.; FERRO CORP.; FIREMAN'S FUND INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; PALLEY SUPPLY COMPANY; FOSS PLATING COMPANY, INC.; KEKROPIA, INC.; PALMTREE ACQUISITION CORPORATION; PHIBRO-TECH, INC.; FIRST DICE ROAD COMPANY, INC.; UNION PACIFIC RAILROAD COMPANY; HALLIBURTON AFFILIATES, LLC; CHERYL A. GOLNICK,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted March 3, 2020
Pasadena, California

Filed August 10, 2020

Before: Consuelo M. Callahan and Jacqueline H. Nguyen, Circuit Judges, and Dana L. Christensen,[*] District Judge.

Opinion by Judge Callahan

## SUMMARY[**]

### Environmental Law

The panel reversed the district court's grant of summary judgment in favor of defendants and remanded for further proceedings in an action seeking contribution for cleanup costs under § 113(f) of the Comprehensive Environmental Response, Compensation, and Liability Act.

The panel held that to trigger the CERCLA limitations period, requiring parties to pursue contribution for their cleanup costs within three years of the "entry of a judicially approved settlement with respect to such costs," a settlement must impose costs on the party seeking contribution. The panel explained that a party can obtain contribution only for costs incurred in excess of its own liability. A settlement,

---

[*] The Honorable Dana L. Christensen, United States District Judge for the District of Montana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

then, starts the limitations period on a § 113(f) claim for response costs only if it imposed such costs and serves as the basis for seeking contribution. The panel concluded that here, plaintiffs' settlement with certain *de minimis* parties did not start the limitations period for contribution claims against different polluters.

The panel further held that plaintiffs were not judicially estopped from seeking contribution for their costs.

---

## COUNSEL

E. Joshua Rosenkranz (argued) and Elizabeth R. Cruikshank, Orrick Herrington & Sutcliffe LLP, New York, New York; Brian P. Goldman, Easha Anand, and Karim J. Kentfield, Orrick Herrington & Sutcliffe LLP, San Francisco, California; Nancy Sher Cohen and Ronald A. Valenzuela, Lathrop Gage LLP, Los Angeles, California; for Plaintiffs-Appellants.

Thomas R. McCarthy (argued), Consovoy McCarthy PLLC, Arlington, Virginia; David E. Cranston, Greenberg Glusker, Los Angeles, California; for Defendant-Appellee Union Pacific Railroad Company.

James B. Harris, Thompson & Knight LLP, Dallas, Texas; for Defendant-Appellee Bodycote Thermal Processing, Inc.

Robert P. Doty (argued) and Cathy T. Moses, Cox Castle & Nicholson LLP, San Francisco, California, for Defendant-Appellee Palmtree Acquisition Corporation.

No appearances by remaining Defendants-Appellees.

Matthew R. Oakes (argued) and Jennifer Scheller Neumann, Attorneys; Eric Grant, Deputy Assistant Attorney General; Environment and Natural Resources Division, United States Department of Justice, Washington, D.C.; Michael Massey, Attorney, United States Environmental Protection Agency; for Amicus Curiae United States.

Xavier Becerra, Attorney General; Sally Magnani, Senior Assistant Attorney General; Edward H. Ochoa, Supervising Deputy Attorney General; Olivia W. Karlin and James Potter, Deputy Attorneys General; Office of the Attorney General, Los Angeles, California; for Amicus Curiae California Department of Toxic Substances Control.

Timothy T. Coates and Marc J. Poster, Greines Martin Stein & Richland LLP, Los Angeles, California, for Amicus Curiae Former United States Department of Justice Official Stephen D. Ramsey.

## OPINION

CALLAHAN, Circuit Judge:

The Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) requires parties to pursue contribution for their cleanup costs within three years of the "entry of a judicially approved settlement with respect to such costs." 42 U.S.C. § 9613(g)(3)(B). This appeal asks whether, to trigger this limitations period, a settlement must impose costs on the party seeking contribution—a question we answer in the affirmative. Because the district court relied on a contrary reading of the statute in holding the plaintiffs' claims time-barred, we reverse its grant of summary judgment in the defendants' favor.

I.

A.

The Omega Chemical Corporation recycled solvents and refrigerants at its facility in Whittier, California, from 1976 to 1991. The company's mishandling of these substances caused them to spill and leak from drums, tanks, and pipes, severely contaminating nearby soil and groundwater. In 1999, the U.S. Environmental Protection Agency (EPA) placed the Omega facility on the National Priorities List, a list of the most contaminated sites in the nation. 64 Fed. Reg. 2942, 2945 (Jan. 19, 1999). The agency then set about developing a long-term remedial plan for cleaning up the site, splitting the process into manageable phases, or "operable units." *See* 40 C.F.R. § 307.14 (defining "operable unit" as "a discrete action that comprises an incremental step toward comprehensively addressing site problems"). EPA first turned toward cleaning up the soil and

groundwater contamination in the immediate vicinity of the Omega plant.  It dubbed this Operable Unit 1 (OU-1).

EPA negotiated the cleanup of OU-1 with a group of Omega's customers, who formed the Omega Chemical Potentially Responsible Parties Organized Group (OPOG). The discussions proved fruitful, with OPOG agreeing to lead the remedial efforts with EPA oversight.  To give a district court authority over that agreement and to trigger OPOG's right to seek contribution, the United States simultaneously lodged a complaint against OPOG with a proposed consent decree resolving that complaint.  The consent decree required OPOG to contain and remediate the groundwater contamination around the Omega plant.  It also required OPOG to reimburse the United States for its cleanup costs. The court entered the consent decree a few months later, in early 2001, thereby resolving OPOG's liability as to OU-1.

Under the applicable statute of limitations, 42 U.S.C. § 9613(g)(3)(B), the entry of the consent decree gave OPOG three years to seek contribution for its OU-1 costs.  So in 2004 OPOG sued various other entities that had sent hazardous waste to the Omega plant.  By and large, these defendants had contributed relatively small amounts of waste.  They were, in EPA parlance, "*de minimis*" parties. *See* 42 U.S.C. § 9622(g) (characterizing *de minimis* parties by the quantity and toxicity of their waste).  OPOG's complaint alleged that it had incurred $6.5 million in cleaning up the site, and it asserted that the *de minimis* parties were liable for their share of OPOG's past and future cleanup costs.

The *de minimis* parties agreed to settle OPOG's claims for $1.7 million.  In exchange, OPOG assumed their "responsibilities" for the site, including their cleanup costs. This assumption was not limited to costs associated with

OU-1; it included any Omega-site claims that the United States or another party might, in the future, assert against the *de minimis* parties. In essence, the settlement allowed these parties to walk away from the site effectively immune from further pursuit. The court approved that settlement in 2007.

EPA was meanwhile investigating Operable Unit 2 (OU-2). The agency had learned that chemicals from the Omega plant had migrated through groundwater and comingled with hazardous waste released from other facilities, forming a toxic plume extending over four miles downgradient of OU-1. In 2011, once EPA better understood the extent of the OU-2 plume, it selected a remedy: an extensive "pump-and-treat" system that would draw contaminated water from the ground and strip it of chemicals.

As it had with OU-1, OPOG agreed to spearhead the cleanup efforts for OU-2. The parties formalized their arrangement in 2016, with the United States again lodging a complaint and corresponding consent decree the same day.[1] This time, though, the litigation concerned the downgradient plume. The consent decree committed OPOG to finance and implement the OU-2 pump-and-treat system. It further obligated OPOG to post a $70 million performance guarantee and reimburse the United States for its past and future OU-2 costs. The court approved the consent decree in 2017, thereby resolving OPOG's liability as to that portion of the site.

---

[1] In 2010, the United States also sued and settled with OPOG for work concerning OU-1 soil contamination.

B.

Several years earlier, in 2014, having already undertaken some OU-2 work, OPOG brought this suit seeking to recover the costs of that work from APC Investment Company and other entities (collectively, the APC defendants) who purportedly had contributed to the plume but not its cleanup. Once OPOG entered into the OU-2 consent decree, it amended its complaint to drop the cost-recovery claim and assert one for contribution in its stead. OPOG also sought a declaration as to the APC defendants' liability "for their respective equitable shares" of the obligations OPOG had incurred under the OU-2 consent decree.

Some of the APC defendants moved for summary judgment, arguing that OPOG's 2007 settlement with the *de minimis* parties triggered CERCLA's three-year statute of limitations for contribution claims. The district court agreed, holding that the 2007 settlement was "with respect to" the same costs sought in this litigation and that, as a result, OPOG's claims were time-barred. Observing that the settlement resolved OPOG's and the *de minimis* parties' site-wide claims against each other, the court reasoned that OU-2 necessarily fell within the scope of their agreement. The court also noted that OPOG was likely estopped from arguing that it could not previously seek contribution for OU-2 costs, since it asserted just such a claim in its 2004 complaint against the *de minimis* parties. The court entered judgment, and OPOG timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and reverse.

II.

We review de novo the grant of summary judgment and interpretation of CERCLA. *Asarco LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1208 (9th Cir. 2015). We also interpret

CERCLA settlements de novo but defer to the district court's factual findings unless they are clearly erroneous. *Id.* And finally, we review a district court's application of the doctrine of judicial estoppel for an abuse of discretion. *MK Hillside Partners v. Comm'r of Internal Rev.*, 826 F.3d 1200, 1203 (9th Cir. 2016).

III.

A.

Congress enacted CERCLA to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [are] borne by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal quotation marks and citation omitted); *accord* S. Rep. No. 96-848, at 13 (1980). To that end, the statute provides two mechanisms for private parties to recoup their cleanup costs: cost-recovery actions under § 107(a), 42 U.S.C. § 9607(a), and contribution actions under § 113(f), *id.* § 9613(f). These related but distinct provisions "complement each other by providing causes of action to persons in different procedural circumstances." *United States v. Atl. Research Corp.*, 551 U.S. 128, 139 (2007) (internal quotation marks and citation omitted).

Section 107(a) enables parties to recover their directly incurred "response"—*i.e.*, cleanup—costs from those liable for the contamination. 42 U.S.C. § 9607(a); *see Key Tronic Corp. v. United States*, 511 U.S. 809, 819 n.13 (1994) (explaining that CERCLA "encourage[s] private parties to assume the financial responsibility of cleanup by allowing them to seek recovery from others" (internal quotation marks and citation omitted)). The provision imposes strict liability, and a successful § 107(a) claim generally results in the

defendant being held jointly and severally liable for all cleanup costs sought in the suit, even those attributable, at least in part, to others. *Arizona v. City of Tucson*, 761 F.3d 1005, 1011 (9th Cir. 2014). Consequently, a cost-recovery defendant often faces a disproportionate share of liability for a site's contamination.

That is where § 113(f) comes in. It provides parties with a right of contribution "to recover expenses paid under a settlement agreement or judgment." *Whittaker Corp. v. United States*, 825 F.3d 1002, 1009 (9th Cir. 2016). Parties subjected to suit under § 107(a) or § 106—which empowers the United States to order certain cleanups—can file for contribution, 42 U.S.C. § 9613(f)(1), as can parties that settle their liability with the United States or a state, *id.* § 9613(f)(3)(B). Hence, a claim for contribution, unlike one for cost recovery, turns on a party first facing or incurring liability to a third party. *Atl. Research*, 551 U.S. at 139–40. If that liability exceeds the particular polluter's portion of responsibility for a cleanup, § 113(f) serves to force others to shoulder their share of the burden. *Id.* at 139.

CERCLA imposes a three-year statute of limitations on § 113(f)(1) contribution claims. 42 U.S.C. § 9613(g)(3). The clock starts to run not when the claims accrue, but upon the occurrence of certain statutory triggering events. As relevant here, the statute bars parties from filing for contribution "for any response costs . . . more than three years after . . . [the] entry of a judicially approved settlement with respect to such costs." *Id.* § 9613(g)(3)(B). We must decide whether the 2007 settlement, which imposed no liability on OPOG but transferred to it the *de minimis* parties' responsibilities for the Omega site, triggered this provision.

B.

Starting, as we must, with the statute's text, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004), we find the limitations provision's applicability to claims for "contribution" largely dispositive. Because "[n]othing in § 113(f) suggests that Congress used . . . 'contribution' in anything other than [its] traditional sense," the term refers to the "tortfeasor's right to collect from others responsible for the same tort after the tortfeasor has paid more than his or her proportionate share." *Atl. Richfield*, 551 U.S. at 138 (quoting Black's Law Dictionary (8th ed. 2004)); *accord Whittaker*, 825 F.3d at 1008. A CERCLA contribution claim, in other words, is by definition predicated upon "an inequitable distribution of common liability among liable parties."[2] *Atl. Richfield*, 551 U.S. at 139.

---

[2] The Restatement elaborates:

> A person seeking contribution must extinguish the liability of the person against whom contribution is sought for that portion of liability, either by settlement with the plaintiff or by satisfaction of judgment. As permitted by procedural rules, a person seeking contribution may assert a *claim* for contribution and obtain a contingent judgment in an action in which the person seeking contribution is sued by the plaintiff, even though the liability of the person against whom contribution is sought has not yet been extinguished.

Restatement (Third) of Torts § 33 cmt. b (citations omitted); *see also Friedland v. TIC-The Indus. Co.*, 566 F.3d 1203, 1206 (10th Cir. 2009) (defining a CERCLA contribution claim as "a claim by and between jointly and severally liable parties for an appropriate division of the payment one of them has been compelled to make" (internal quotation marks and citation omitted)).

Bearing that in mind, interpreting the limitations provision is fairly straightforward.  It provides that a party must pursue contribution following the entry of a "settlement with respect to such costs."  The term "such costs" plainly refers to the response costs sought in the contribution action.  And since a party can obtain contribution only for costs incurred in excess of its own liability, an action under § 113(f)(1) is necessarily for another's share of the costs faced or imposed under § 106 or § 107(a).  *See Am. Cyanamid Co. v. Capuano*, 381 F.3d 6, 13 (1st Cir. 2004) ("'[S]uch costs' . . . refers to the judgment mentioned earlier in the sentence and identifies a particular claim or payment.").  A settlement, then, starts the limitations period on a § 113(f)(1) claim for response costs only if it imposed those costs and serves as the basis for seeking contribution.

It is therefore inaccurate to characterize the 2007 settlement as covering the costs at issue here merely because it foresaw the remediation of the OU-2 groundwater plume.  OPOG's claims do not concern OU-2 in the abstract.  Rather, OPOG seeks the APC defendants' share of the liability it assumed in the 2017 OU-2 consent decree.  The 2007 settlement did not address those costs.  It resolved neither who would pay for OU-2's remediation nor what that effort would entail.  Nor did it impose on OPOG any response costs or remedial obligations.  That OPOG agreed to forego further contribution from the *de minimis* parties and, in effect, to indemnify them for future cleanup work bears no relation to the APC defendants' responsibility for the site.  The 2007 settlement, after all, did not extinguish OPOG's and the APC defendants' common liability to the United States for OU-2.  Accordingly, that agreement did not start the limitations period.

C.

The APC defendants disagree, of course. They point out that "with respect to" is broad qualifying language, and that the limitations provision mentions costs alone—not obligations, liabilities, or responsibilities. They advise against reading into the statute any such requirement, especially since Congress expressly required a resolution of liability in § 113(f)(3)(B), which authorizes contribution claims upon settling with the government. Thus, in the APC defendants' view, any settlement starts the clock so long as it relates in some way to the general category of costs at issue in the contribution action.

But we construe statutory language in context, *Celanese*, 792 F.3d at 1210, and we limit otherwise capacious terms when that context "tug[s] . . . in favor of a narrower reading," *Mellouli v. Lynch*, 135 S. Ct. 1980, 1990 (2015) (some alterations omitted) (quoting *Yates v. United States*, 574 U.S. 528, 539 (2015)). Here, we see no reason why a settlement cashing out minor polluters from future involvement with a site would trip the limitations period for contribution claims against different polluters. Section 113(f) instead confirms that the clock starts ticking only upon the entry of a judgment or settlement resolving an underlying § 106 or § 107(a) claim and imposing liability on a polluter, who then has three years to seek contribution for those imposed costs.

To begin with, the APC defendants' position contravenes not only the central tenet of common-law contribution, but also the "standard rule" that a limitations period does not run—let alone expire—before a party can assert the associated claim. *Green v. Brennan*, 136 S. Ct. 1769, 1776 (2016); *see also Asarco LLC v. Atl. Richfield Co.*, 866 F.3d 1108, 1124 n.8 (9th Cir. 2017) (construing CERCLA to avoid this very inconsistency). A party's right

to seek contribution extends only to the costs for which it is potentially or actually liable, as bounded by the operative complaint, settlement, or judgment. *See Whittaker*, 825 F.3d at 1012. So if a party is never sued and never deemed liable for a particular subset of a site's cleanup costs, then those costs are not recoverable under § 113(f)(1). Under the APC defendants' broad construction of "settlement" and "costs," however, the limitations period could expire prior to the filing of a § 106 or § 107(a) claim.

This case illustrates the point. The United States' 2000 complaint sought from OPOG the "reimbursement of *certain* costs" and the "performance of *certain* response actions" needed to clean up a "*portion*" of the Omega site. It did not address site-wide liabilities. And even if it had, the consent decree filed alongside the 2000 complaint dispels any doubt as to the scope of OPOG's then-existing contribution rights. *See id.* (basing a party's § 113(f)(1) rights on the liability imposed in the resolved § 107(a) action rather than faced in the complaint underlying that action). That agreement dealt only with OU-1. It resolved the pending suit but left open the prospect of the United States later pursuing OPOG for liability arising from other parts of the site. Once the court entered the OU-1 consent decree, OPOG had three years to seek reimbursement under § 113(f) for the costs therein incurred. But it had no right to contribution outside of that.[3]

---

[3] The APC defendants argue that the 2001 consent decree did not limit OPOG's contribution rights because § 113(f)(1) allows a party to seek contribution "during or following" the underlying § 106 or § 107(a) action. We rejected a nearly identical argument in *Whittaker*, explaining that although "the statute permits a party to initiate a contribution action while a § 107 . . . suit is pending, actual recovery under § 113(f)(1) is limited to the expenses for which the party is found liable." 825 F.3d at 1012. This comports with "how contribution claims traditionally work." *Id.* (citing Restatement (Third) of Torts § 23(b) & cmt. b). So

*See id.* at 1008–09; *Celanese*, 792 F.3d at 1209 ("[Section 113(f)(1)] remains open while the [§ 106 or § 107(a)] lawsuit is unresolved."). Not until 2016, when the United States sued OPOG for the downgradient plume, could it pursue contribution for its OU-2 costs. Yet the APC defendants' reading of the statute would mean that the limitations period on that claim expired six years earlier, in 2010, which strikes us as nonsensical.[4]

The APC defendants' focus on the 2007 settlement also ignores CERCLA's symmetrical scheme for pursuing contribution claims. With § 113(f)(1), Congress paired the events opening the door to contribution with the events closing it. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 167 (2004) (noting § 113(g)(3)'s "corresponding" limitations periods). A contribution claim accrues when a party is sued under § 106 or § 107(a), and then "the statute of limitations begins to run once *that litigation* settles or ends by judgment." *Celanese*, 792 F.3d at 1209 (emphasis added); *see also id.* at 1210 (reiterating the same idea). This framework clearly contemplates that the underlying § 106 or § 107(a) suit will lead to the defendant's liability: being sued anticipates that liability,

_____

here, following resolution of the United States' 2000 suit, OPOG could have sought contribution only for "the costs for which [it] was held liable" in that suit. *Id.* Other costs were recoverable by way of § 107(a). *See id.* at 1009; *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 225–26 (3d Cir. 2010) (holding that the parties could pursue incurred costs under § 107(a) but not § 113(f) "because those parties were never themselves sued for those amounts").

[4] For similar reasons, the 2010 litigation concerning soil contamination, *see supra* n.1, likewise failed to give rise to a contribution claim for OU-2 costs. That is especially true given that the United States filed that suit after the limitations period on OPOG's pending claims purportedly expired.

and the resulting settlement or judgment establishes it. The statute of limitations sensibly starts then, once the defendant knows the scope of its obligations. But the 2007 settlement arose well before that point. It resolved no suit against OPOG and stemmed instead from OPOG's own claims against the *de minimis* parties. Having the limitations period run from such agreements would make a mess of both § 113(f) and the traditional workings of contribution. The better reading is that the provision's reference to settlements means the agreement imposing the costs in question.[5]

Indeed, our case law supports, if not compels, this conclusion. *Celanese*, for example, also involved two settlements concerning the cleanup of a contaminated site. There we looked to which settlement underlay the plaintiff's

---

[5] We note in this respect that, in addition to judgments and settlements, two other events trigger CERCLA's statute of limitations for contribution claims: administrative—*i.e.*, EPA—settlements with *de minimis* parties, and administrative settlements for cost recovery. 42 U.S.C. § 9613(g)(3). Each imposes liability on the party pursuing contribution, so we construe "judicially approved settlements" similarly—as referring to agreements requiring a party to clean up a site under § 106 or pay response costs under § 107(a). *See Beecham v. United States*, 511 U.S. 368, 371 (1994) ("[S]everal items in a list shar[ing] an attribute counsels in favor of interpreting the other items as possessing that attribute as well.").

The legislative history is in accord. The House report explains that Congress added § 113(f) to confirm "the right of a person *held jointly and severally liable* under CERCLA to seek contribution from other potentially liable parties, when the person believes that it has assumed a share of the cleanup or cost that may be greater than its equitable share." H.R. Rep. No. 99-253(I), at 79 (1985) (emphasis added). The report adds, in this vein, that "[p]arties who settle for all or part of a cleanup or its costs, or who pay judgments as a result of litigation, can attempt to recover some portion of their expenses and obligations in contribution litigation." *Id.* at 80; *accord* S. Rep. No. 99-11, at 43 (1985).

§ 113(f) contribution claim. 792 F.3d at 1210. We held the claim time-barred because it was for "exactly the same liability" assumed in the much earlier agreement. *Id.* at 1214. Critically, that initial agreement comprehensively "define[d] who [would] pay for the work and the nature of the work to remediate" the site. *Id.* at 1213 (likening the earlier agreement to "a proportionate liability declaratory judgment"). The later settlement may have fixed those costs, we explained, but it imposed no new ones. *Id.* at 1214. We further noted that nothing prevented "a party in an early settlement from seeking contribution related to a later settlement, as long as those settlements cover separate *obligations*." *Id.* at 1215 (emphasis added).

In contrast to the underlying settlement in *Celanese*, the 2007 settlement neither imposed any costs on OPOG nor obligated it to clean up OU-2. True, the 2007 settlement transferred to OPOG the *de minimis* parties' "responsibilities" for the site, including any of their prospective future costs for the groundwater plume.[6] But that is of no moment, as the settlement did not create any liability on OPOG's part. What is more, OPOG's release of the *de minimis* parties had no impact on the APC defendants' share of responsibility for the plume, which remained outstanding.

While the 2007 settlement fell short of triggering the limitations period, the 2017 consent decree fits the bill. It resolved the United States' § 106 and § 107(a) claims against OPOG for OU-2. In doing so, it established OPOG's

---

[6] In 2007, EPA was years away from selecting a remedy for the plume, and no party was yet liable for its remediation. To date, OPOG is the only entity to have pursued any CERCLA claim against the *de minimis* parties with respect to the Omega site.

response obligations for that portion of the site and burdened OPOG with the APC defendants' share of liability to the United States. It, therefore, is the settlement that is "with respect to" the costs OPOG now seeks. And because OPOG filed this suit within three years of the entry of that consent decree, its claims are timely.

## D.

Mooring the limitations provision to the settlement giving rise to the contribution costs also serves CERCLA's remedial objectives. As this case amply demonstrates, the cleanup of contaminated sites can span many years and involve scores of litigants. Settling with *de minimis* parties plays an important role in streamlining this process. Cashing out minor contributors can supply a needed influx of funds for cleanup work, and releasing them from future liability can reduce the number of parties involved, simplifying litigation and reducing transaction costs.

The APC defendants' reading of the limitations provision as including settlements untethered to resolved or pending § 106 or § 107(a) claims would throw a wrench into this process. It would dissuade major polluters from providing a complete release to any party, however minor that party's role in contributing to a site's contamination. That is because any such release would require major polluters to then file all possible contribution claims concerning the site, even when the bounds of site-wide liability remain undefined. The parties to such a suit would, in turn, have to fight over their respective equitable shares of response costs that the United States or another party may never pursue. Here, OPOG would have had to sue for contribution for OU-2 despite EPA having yet to select a remedy for the plume. While § 113(f)(1) was intended to "bring[] all . . . responsible parties to the bargaining table at

an early date," *Whittaker*, 825 F.3d at 1013 (Owens, J., concurring) (quoting H.R. Rep. No. 99-253(I), at 80 (1985)), it does not operate to prohibit the phased and orderly resolution of response obligations for complex sites.

The APC defendants protest that, to avoid tripping the limitations provision, major polluters can always cabin their releases to particular parts of a site, similar to how the United States proceeded in iterative stages with OPOG. Yet this approach would undo much of the benefit derived from *de minimis* settlements in the first place. As EPA guidance explains, the legal fees and other transaction costs of negotiating with *de minimis* parties often dwarf their ultimate share of site-wide liability. 52 Fed. Reg. 24,333, 24,334 (June 30, 1987). The early dismissal of these parties thus serves the interests of all involved. Repeatedly dragging them to the table, on the other hand, would bog down negotiations, increase costs, and discourage settlement, given the lack of finality and certainty otherwise afforded by a complete release. *See United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 89 (1st Cir. 1990) (discussing some of the benefits associated with *de minimis* settlements). Such an outcome neither hastens cleanups nor ensures that responsible parties bear the costs.

## IV.

Finally, we conclude that OPOG is not judicially estopped from seeking contribution for its OU-2 costs. "Judicial estoppel is an equitable doctrine that precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001) (first citing *Rissetto v. Plumbers & Steamfitters Local* 343, 94 F.3d 597, 600–01 (9th Cir. 1996); then citing *Russell v. Rolfs*, 893 F.2d 1033,

1037 (9th Cir. 1990)). According to the APC defendants, OPOG successfully pursued contribution for OU-2 costs in its 2004 suit against the *de minimis* parties, so it cannot now contend that such a claim arose only recently, upon entry of the OU-2 consent decree.

This argument is largely beside the point. Even if OPOG had obtained from the *de minimis* parties contribution for OU-2, the 2007 settlement did not start the limitations period because it did not impose on OPOG the APC defendants' share of liability for the downgradient plume. Furthermore, we discern no clear inconsistency in OPOG's position. The 2004 litigation necessarily involved a § 113(f) claim for the costs OPOG had assumed under the 2001 OU-1 consent decree, and a § 107(a) claim for the other costs OPOG had incurred but for which it had not, at that point, been sued. Although OPOG's complaint labeled the claims as for "contribution," it cited to § 107(a) in addition to § 113(f). Moreover, OPOG's 2006 motion for judicial approval of the resulting settlement was clearer in this regard. It explained that the claims were for contribution *and* cost recovery.[7] *See Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1064 n.2 (9th Cir. 2002) (looking to a claim's substance rather than its caption). OPOG's current position is thus

---

[7] Prior to the Supreme Court holding in 2007 that potentially responsible parties could proceed under § 107(a), *Atl. Research*, 551 U.S. at 141, this circuit took the view that any action between such parties was "necessarily for contribution." *See Kotrous v. Goss-Jewett of N. Cal.*, 523 F.3d 924, 932 (9th Cir. 2008) (overruling this position). It therefore makes sense that OPOG would have so styled its claims.

consistent with its earlier one, and the district court erred in concluding otherwise.[8]

## V.

In sum, we hold that Congress incorporated into CERCLA basic precepts of common-law contribution. Chief among those precepts is that contribution turns on a party having incurred an inequitable share of another's liability.   CERCLA's limitations period, 42 U.S.C § 9613(g)(3)(B), runs upon the entry of the settlement imposing that liability, but not before.  The statutory text supports this reading, as does its purpose.  We therefore reverse the district court's holding that OPOG's claims are untimely and remand the case for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[8] Contrary to the APC defendants' contention, OPOG did not forfeit its right to rebut this argument at two hearings and in its supplemental summary judgment briefs.  We may review any matter passed upon by the district court, *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1260 n.8 (9th Cir. 2010) (citing *Blackmon-Malloy v. U.S. Capitol Police Bd.*, 575 F.3d 699, 707 (D.C. Cir. 2009)), and, in any event, OPOG did discuss the issue.  At the first hearing OPOG argued that estoppel was inextricably tied to the characterization of the 2007 settlement.  At the second hearing the APC defendants broached estoppel only in asking for a clear ruling on the matter.  And as for the supplemental briefs, estoppel was not among the matters the district court had ordered addressed.