FILED

OCT 29 2024

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**ORDERED PUBLISHED**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: <br> JOHN E. KING, <br><br> Debtor. | BAP No. CC-24-1007-LFS <br><br> Bk. No. 9:22-bk-10674-RC |
| WOLVERINE ENDEAVORS VIII, LLC, <br><br> Appellant, <br> v. <br> EAST WEST BANK; INSURANCE <br> COMPANY OF THE WEST; FENCE <br> FACTORY, INC.; JOHN E. KING, <br><br> Appellees. | **OPINION** |

Appeal from the United States Bankruptcy Court
for the Central District of California
Ronald A. Clifford, Bankruptcy Judge, Presiding

APPEARANCES

Myron Moskovitz argued for appellant; William Charles Beall of Beall &
Burkhardt argued for appellee John E. King.

Before: LAFFERTY, FARIS, and SPRAKER, Bankruptcy Judges.

LAFFERTY, Bankruptcy Judge:

1

## INTRODUCTION

Wolverine Endeavors VIII, LLC ("Wolverine") appeals the bankruptcy court's order dismissing the involuntary chapter 7[1] petition it filed against John E. King.

After Wolverine filed a petition against Mr. King, certain creditors filed joinders to the involuntary petition pursuant to § 303(c). Fence Factory, Inc. ("Fence Factory"), a small trade creditor to which Mr. King owes a monthly debt, was one of those joining creditors.

There is no dispute that Fence Factory was owed money as of the petition date based on an unpaid invoice. However, shortly after the petition date, a third party satisfied the invoice. As such, by the time Fence Factory joined the involuntary petition, the invoice pending on the petition date had been paid.

Section 303(c) allows creditors "holding" a claim and meeting certain requirements to join an involuntary petition with the same effect as if they were an original petitioning creditor. The bankruptcy court, relying largely on the fact that the word "holding" is in the present tense, ultimately concluded that Fence Factory could not join the petition because it was no longer "holding" a claim on the date it filed its joinder. Wolverine

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532 and "Civil Rule" references are to the Federal Rules of Civil Procedure.

disagrees with this interpretation, arguing that creditors should be able to join a petition if they held a claim on the petition date.

This appeal presents a difficult question of first impression. The parties have not presented, and the Panel could not find, any authorities directly addressing the issues raised in this appeal. In fact, cases discussing involuntary petitions are sparse because the "vast bulk" of bankruptcy cases are voluntarily commenced by a debtor. *Wechsler v. Macke Int'l Trade, Inc. (In re Macke Int'l Trade, Inc.)*, 370 B.R. 236, 245 (9th Cir. BAP 2007); *see also* Voluntary and Involuntary Bankruptcy Cases Filed by Chapter of the Bankruptcy Code, *https://www.uscourts.gov/sites/default/files/data_tables/jff_7.2_0930.2023.pdf* (last visited October 28, 2024) (aggregating numbers showing that in 2023, of the 433,658 bankruptcy cases that were filed, only 266 were involuntary cases). As a result, case law only tangentially guides our opinion herein.

Although the bankruptcy court's construction of the word "holding" is relevant, we believe other statutory provisions compel a different interpretation than the one reached by the bankruptcy court. A holistic review of the statutory scheme governing involuntary petitions and important policy considerations lead us to the conclusion that Fence Factory qualified as a joining creditor under § 303(c).

We REVERSE the portion of the bankruptcy court's order that is inconsistent with this opinion and REMAND for the bankruptcy court to rule on Fence Factory's request to withdraw its joinder.

# FACTS[2]

On August 31, 2022, Wolverine filed an involuntary chapter 7 petition against Mr. King.[3] In the petition, Wolverine asserted that it had a claim of $7,077,693.78 against Mr. King stemming from a judgment entered in 2011 and renewed in 2021. At the time, Mr. King also had several other outstanding judgments against him. Combined with Wolverine's claim, Mr. King owed over $29 million in unpaid judgments.[4]

Mr. King filed a motion to dismiss the involuntary petition. Among other things, Mr. King argued that he had more than twelve countable creditors and, as a result, a viable involuntary case required at least three petitioning creditors pursuant to § 303(b)(1).

---

[2] We have taken judicial notice of the bankruptcy court docket and various documents filed through the electronic docketing system. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957-58 (9th Cir. 1989); *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

[3] Concurrently, Wolverine filed a separate involuntary chapter 7 petition against Mr. King's wife, Carole D. King.

[4] In its briefs, Wolverine contends that the bankruptcy court erred by sustaining Mr. King's objection to admission of his judgment debtor examination. However, Wolverine references this transcript for the purpose of discussing background facts that are not relevant to the issues on appeal. "[W]ith respect to erroneous evidentiary rulings, such rulings do not constitute reversible error unless it is more likely than not that the rulings changed the outcome of the lawsuit." *Van Zandt v. Mbunda (In re Mbunda)*, 484 B.R. 344, 355 (9th Cir. BAP 2012), *aff'd*, 604 F. App'x 552 (9th Cir. 2015). Because Wolverine has not articulated how this evidentiary ruling would impact the outcome of this matter, the ruling does not constitute reversible error.

In May 2023, Fence Factory filed a joinder to the involuntary petition against Mr. King.[5] In its joinder, Fence Factory indicated that it had a claim against Mr. King based on an "[o]ngoing trade debt" in the amount of $44.55. This ongoing debt stemmed from an arrangement between Fence Factory and King Ventures (Mr. King's sole proprietorship) through which King Ventures rented a fence from Fence Factory in return for monthly payments of $44.55. Although the record does not include details about the parties' prepetition arrangement, the record reflects that the monthly rental arrangement between the parties began before the petition date and continued intact through the date Fence Factory joined the petition.

The parties do not dispute that, as of the petition date, King Ventures owed Fence Factory $44.55 based on an invoice dated August 19, 2022. The parties also do not dispute that, two days after the petition date, a third party paid Fence Factory $44.55 and satisfied the outstanding invoice.

Notwithstanding the joinders, Mr. King continued to assert that the involuntary petition should be dismissed, arguing, among other things, that Fence Factory did not qualify as a petitioning creditor under § 303(b). Concluding that Mr. King's motion to dismiss and the responses thereto presented matters outside the pleadings, the bankruptcy court treated the motion as a motion for summary judgment. Thereafter, the court set an evidentiary hearing to adjudicate the issues raised in the motion to dismiss.

---

[5] Insurance Company of the West and East West Bank also filed joinders to the involuntary petition.

Prior to the evidentiary hearing, the parties were given the opportunity to: (i) obtain discovery and file discovery related motions; (ii) issue subpoenas and file motions to quash the subpoenas; (iii) file a pretrial stipulation outlining the issues of law and fact to be tried and designating witnesses and exhibits; (iv) file motions in limine in preparation for the evidentiary hearing; and (v) file trial briefs.

Shortly before the evidentiary hearing, Fence Factory filed a withdrawal of its joinder to the involuntary petition. Although Wolverine opposed the request, the bankruptcy court never ruled on Fence Factory's request to withdraw.

On October 3, 2023, over one year after Wolverine initially filed the involuntary petition, the bankruptcy court held an evidentiary hearing. After the evidentiary hearing, the court entered an order dismissing the involuntary petition against Mr. King. As relevant to this appeal, the court held that Fence Factory was not qualified to act as a petitioning creditor.

In support of this holding, the bankruptcy court noted that § 303(c), the statute allowing joinders to involuntary petitions, provides that only creditors "holding" certain types of claims may join an involuntary petition. Reasoning that the term "holding" is in the present tense, the bankruptcy court concluded that creditors who join an involuntary petition must hold a claim at the time they file their joinder, even if they held a claim on the petition date and would have otherwise qualified as a petitioning creditor on that date. Because Fence Factory's petition date

claim had been satisfied by the time Fence Factory joined the petition, the bankruptcy court held that Fence Factory did not qualify as a petitioning creditor under § 303(c). Consequently, because only two petitioning creditors remained,[6] the bankruptcy court dismissed the involuntary petition for failure to comply with § 303(b)(1). Wolverine timely appealed.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction over the bankruptcy court's determination under 28 U.S.C. § 158.

## ISSUES

1.  May a trade creditor with a debt billed monthly join an involuntary petition under § 303(c) if the debt owed to it on the petition date was satisfied prior to the filing of the joinder?

2.  Did the bankruptcy court's procedures violate Wolverine's due process rights or prejudice Wolverine?

## STANDARDS OF REVIEW

The parties dispute the appropriate standard of review. Wolverine contends that the bankruptcy court's ruling was on a summary judgment,

---

[6] In its ruling dismissing the involuntary petition, the bankruptcy court also held that East West Bank did not qualify as a petitioning creditor because Wolverine was the purchaser and assignee of all of East West Bank's rights, title, and interest in the judgment against Mr. King; as a result, the bankruptcy court held that, to the extent East West Bank had any claim against the estate, East West Bank and Wolverine would be counted as a single creditor. Wolverine does not challenge this holding on appeal.

such that a de novo standard should be applied. Mr. King asserts that the bankruptcy court issued a ruling after an evidentiary hearing, such that the Panel must review the court's findings of fact under the clearly erroneous standard and its conclusions of law de novo.

Although the bankruptcy court and the parties may have referred to the October 3, 2023, hearing by various names, ultimately, the fact remains that the bankruptcy court held an evidentiary hearing on the issues that are currently on appeal. The bankruptcy court's order of dismissal includes both its findings of fact and conclusions of law as to those issues.

Moreover, the bankruptcy court did not dismiss the petition against Mr. King as having inadequate allegations for purposes of Civil Rule 12(b)(6). Nor did the bankruptcy court dismiss the petition using a summary judgment standard, i.e., by assessing whether there were any genuine issues of material fact. In fact, the bankruptcy court's decision to hold an evidentiary hearing demonstrated that there *were* genuine issues of material fact necessitating an evidentiary hearing.

As a result, and notwithstanding the court's or the parties' characterization of the proceedings before the bankruptcy court, the bankruptcy court conducted an evidentiary hearing. Where an order is entered after an evidentiary hearing, "we review the bankruptcy court's findings of fact for clear error, and its conclusions of law *de novo*." *Thiara v. Spycher Bros. (In re Thiara)*, 285 B.R. 420, 426-27 (9th Cir. BAP 2002) (citing *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1142 (9th Cir. 2002)).

In any event, the facts relevant to this opinion are not disputed by the parties, and neither party challenges any of the relevant findings of fact made by the bankruptcy court regarding the pertinent issues on appeal. As such, the Panel's review herein is limited to the bankruptcy court's conclusions of law, or the bankruptcy court's application of the law to facts, both of which are reviewed de novo. *Id.* at 427; *see also Aetna U.S. Healthcare, Inc. v. Madigan (In re Madigan)*, 270 B.R. 749, 753 (9th Cir. BAP 2001) ("We review *de novo* the bankruptcy court's application of undisputed facts to the law. . . .").

"Whether a person's due process rights have been violated is a mixed question of law and fact, which is reviewed de novo." *Hasso v. Mozsgai (In re La Sierra Fin. Servs., Inc.)*, 290 B.R. 718, 726 (9th Cir. BAP 2002).

Under a de novo review, we look at the matter anew, giving no deference to the bankruptcy court's determinations. *Barnes v. Belice (In re Belice)*, 461 B.R. 564, 572 (9th Cir. BAP 2011).

## DISCUSSION

On appeal, Wolverine contends that the bankruptcy court erred by using the date of joinder, as opposed to the petition date, to determine whether Wolverine was "holding" a claim for purposes of § 303(c). We agree. As we discuss in section A.1., both relevant statutes and policy concerns indicate that the petition date is the relevant date to assess whether a creditor may join a petition.

9

Additionally, as we discuss in section A.2., even under the bankruptcy court's interpretation of the word "holding," Fence Factory's status as a trade creditor with an ongoing debt means that Fence Factory was "holding" a claim on the date it filed its joinder. Finally, as discussed in section B, Wolverine has not articulated any prejudice it suffered from the bankruptcy court's procedures in this case, and we will not disturb the portions of the court's order that do not conflict with this opinion.

## A.    Fence Factory qualified as a petitioning creditor under § 303(c).

As always, our interpretation of the Code "starts where all such inquiries must begin: with the language of the statute itself." *Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011) (internal quotation marks omitted). Pursuant to § 303(c):

> After the filing of a petition under this section but before the case is dismissed or relief is ordered, a creditor holding an unsecured claim that is not contingent, other than a creditor filing under subsection (b) of this section, may join in the petition with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section.

"A primary canon of statutory interpretation is that the plain language of a statute should be enforced according to its terms, **in light of its context**." *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1210 (9th Cir. 2015) (citations omitted) (emphasis added). "Thus, we examine the statute as a whole, including its purpose and various provisions." *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 880 (9th Cir. 2001).

In its order dismissing the involuntary petition against Mr. King, the bankruptcy court focused on the tense of the word "holding" to conclude that Fence Factory was disqualified as a petitioning creditor. Specifically, the bankruptcy court interpreted the use of the present tense as Congress's intention to limit joinders under § 303(c) to creditors who are owed money at the time of joinder, as opposed to at the time the petition is filed.

The tense of the word "holding" is certainly relevant. After all, "Congress' use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). However, to assess properly Congress's intent, we must consider the word in the context of the entire statute. Here, three contextual clues lead us to a different result.

First, § 303(c) itself requires that creditors join "with the same effect as if such joining creditor were a petitioning creditor under section (b) of this section." As discussed below, the qualifications of petitioning creditors are assessed as of the petition date.

Second, § 303, taken as a whole and as interpreted by courts, contemplates that the bankruptcy court will make all relevant determinations related to an involuntary petition on the petition date.

Finally, the word "holding" modifies the word "claim" such that the two words must be interpreted together. In this case, because Fence Factory is a trade creditor with an ongoing debt, an undisputed fact that was before the bankruptcy court, the word "claim" is expansive enough to include the

11

debt owed to Fence Factory. This is so even if we use the construction of "holding" used by the bankruptcy court.

### 1. Section 303, including § 303(c), requires assessment of all claims as of the petition date.

As noted above, § 303(c) provides that a creditor joining an involuntary petition joins "with the same effect as if such joining creditor were a petitioning creditor under subsection (b) of this section." Congress's inclusion of this clause in § 303(c) suggests an intention to relate joinders back to the petition date and to assess the qualifications of a joining creditor in the same manner as a petitioning creditor. Because the qualifications of petitioning creditors are assessed as of the petition date, § 303(c) would seem to require that the qualifications of joining creditors be assessed as of the same date.

This interpretation also makes sense when read in conjunction with § 303(h). Under § 303(h)(1), a bankruptcy court shall enter an order for relief if "the debtor is generally not paying such debtor's debts as such debts become due . . . ." "The 'generally not paying' test is to be applied as of the date of filing of the involuntary petition. . . ." *Hayes v. Rewald (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 779 F.2d 471, 475 (9th Cir. 1985) (citation omitted). "The authority of the court is triggered and guided by the totality of the circumstances existing when the petition is filed." *Id.*

In light of the above, the snapshot of the alleged debtor's relationships with its creditors must be taken on the petition date. As a

result, the most harmonious interpretation of § 303(b), (c), and (h) is to use the petition date to analyze **every** requirement under § 303, whether such requirements relate to the qualifications of creditors under § 303(b) and (c) or the financial affairs of the alleged debtor under § 303(h).

Nevertheless, an argument could be made that Congress included the word "holding" in its present tense because the statute requires joining creditors to hold a claim **both** on the petition date **and** continue to hold that claim on the date they join the petition. The bankruptcy court appears to have interpreted § 303(c) in this way, expressing concern that an alternative interpretation would allow "noncreditors" to join a petition.

However, there are two problems with this interpretation. First, while we acknowledge that the participation of parties without an interest in the bankruptcy case may be problematic, we do not believe that postpetition satisfaction of a party's claim necessarily renders that party a "noncreditor." A "creditor" is simply defined as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." § 101(10).[7] If an order for relief is entered, the Code requires that courts determine the allowability of a claim "as of the date of the filing of the petition." § 502(b).

Even if a claim is paid during the gap period between the petition date and the order for relief, once an order for relief is entered and unless

_____

[7] In involuntary cases where a claim existed as of the petition date, it necessarily also "arose" before entry of any order for relief.

an exception applies,[8] the transferee would be obligated to return the transfer to the estate; thereafter, the transferee could assert a claim against the estate based on the amount owed to it as of the petition date. § 502(d). Consequently, we do not agree that parties who are paid during the gap period automatically transform into "noncreditors,"[9] or that such parties lose any stake in a bankruptcy case against the alleged debtor.

Second, as discussed above, the plain language of § 303(c) requires that, except as explicitly set forth in § 303(c) itself, petitioning creditors and joining creditors must be treated in the same manner. As stated by the Ninth Circuit, it is a "rather obvious proposition" that alleged debtors cannot defeat an involuntary petition by paying off petitioning creditors. *Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.) ("Vortex Fishing")*, 277 F.3d 1057, 1065 (9th Cir. 2002) (quoting *Reed v. Thornton*, 43 F.2d 813, 813 (9th Cir. 1930)).[10]

---

[8] As discussed below, Congress has made exceptions for certain transfers made during this gap period to encourage creditors to continue conducting business with the alleged debtor. *See, e.g.,* § 549(b).

[9] In addition, trade creditors such as Fence Factory, also may be "creditors" by operation of § 502(f), as further discussed below.

[10] In *Vortex Fishing*, the Ninth Circuit concluded that the joining creditor in that case could withdraw its joinder even though such withdrawal ultimately defeated the involuntary petition. *Vortex Fishing*, 277 F.3d at 1065-66. Although paying off a petitioning creditor to defeat an involuntary petition was against public policy, the circuit observed that such policy concerns were not implicated when the withdrawal was "based on a misunderstanding or misrepresentation as to the purpose and effect of a joinder." *Id.* at 1065 (internal quotation omitted). Thus, *Vortex Fishing* did not involve the policy concerns related to paying off petitioning creditors. (Footnote continues.)

Adopting the bankruptcy court's interpretation would create an exception to this proposition; specifically, using the bankruptcy court's construction, alleged debtors would not be able to defeat an involuntary petition by paying off **petitioning** creditors, but could defeat an involuntary petition by paying off **joining** creditors. Such an exception would not only run afoul of the equal treatment mandate of § 303(c), but would also implicate the same serious policy concerns highlighted in *Vortex Fishing* and *Reed*. To wit, from a policy standpoint, there is little difference between an alleged debtor paying a petitioning creditor to defeat a petition and paying a **potential** petitioning creditor to defeat a petition.

The bankruptcy court did not believe such policy concerns were implicated in this case because Fence Factory filed its joinder months after it was paid. That may very well be true. However, for purposes of general application, holding that creditors whose claims are satisfied postpetition may not join a petition would pave the way for serious abuse by alleged debtors and creditors alike. For instance, alleged debtors may pick and choose which claims to pay to defeat a petition. Alternatively, creditors may threaten to join a petition unless the alleged debtor satisfies the debt

---

As noted in the facts section above, Fence Factory did move to withdraw its joinder. Wolverine opposed the motion to withdraw. However, the bankruptcy court did not rule one way or another on Fence Factory's request to withdraw because it disqualified Fence Factory as a petitioning creditor. As stated below, on remand, the bankruptcy court should address whether Fence Factory may withdraw its joinder to the petition.

owed to them. Either scenario would run counter to one of the core goals of involuntary petitions, namely, to prevent select creditors from "racing to the courthouse to dismember the debtor." *Marciano v. Chapnick (In re Marciano)*, 708 F.3d 1123, 1128 (9th Cir. 2013) (quoting *Danning v. Bozek (In re Bullion Rsrv. of N. Am.)*, 836 F.2d 1214, 1217 (9th Cir. 1988)). A holding that all claims must be assessed as of the petition date, including claims held by joining creditors, prevents this type of gamesmanship.

Additional policy concerns related to trade creditors that transact with alleged debtors during the gap period between the petition date and the order for relief (or dismissal) also bolster our conclusion. In an effort to encourage trade creditors to continue working with the alleged debtor during this gap period, Congress took great care to protect such creditors. *See* § 303(f) (authorizing the continuation of the alleged debtor's business during the gap period).

For instance, such creditors may have any claims arising during the gap period afforded priority if an order for relief is entered, § 502(f), or be protected from the extensive avoidance and recovery powers of the trustee or debtor-in-possession. § 549(b). *See In re Hanson Indus., Inc.*, 90 B.R. 405, 413 (Bankr. D. Minn. 1988) ("Section 502(f) was intended to protect the creditors who deal with an involuntary debtor during the gap period, such as lessors, trade creditors and similar parties, consistent with section 303(f)'s specific grant to the involuntary debtor to conduct its business in ordinary fashion while its status is resolved."). It would be odd if Congress

16

explicitly drafted multiple statutes to protect such creditors while at the same time disenfranchising such creditors from joining an involuntary petition simply because an alleged debtor (or other colluding party) pays an invoice postpetition.

We recognize that the bankruptcy court engaged in a close analysis of the statutory language and that the court's conclusion is hardly irrational. Nevertheless, it is unlikely that Congress would have used the present participle of a verb to impliedly exclude certain creditors from joining a petition – and thus prevent the initiation of an involuntary petition altogether – instead of explicitly stating that such creditors do not qualify as joining petitioners under § 303(c).

Ultimately, we must interpret § 303(c) to give effect to the purpose of involuntary petitions, which is to provide an egalitarian process whereby legitimate creditors may place an alleged debtor into a system, overseen by a court, through which creditors' claims can be contemporaneously evaluated and the debtor's assets fairly distributed. A trade creditor joining a petition between the payment of one invoice and the maturation of another does not offend either this purpose or any of the policy considerations above.

In addition, where there is a revolving debt owed to a trade creditor, the answer to whether an invoice is or is not due changes depending on

when the court conducts its analysis.[11] Thus, during the volatile involuntary gap period where circumstances may change on a daily basis, it makes little sense to waste judicial resources investigating the specific due dates of invoices.

Instead, to the extent the word "holding" is meant to limit joinder to creditors who are presently impacted by the alleged debtor's financial condition, Congress likely used the word to simply require that courts assess whether joining creditors are proper parties in interest, i.e., whether such creditors own claims against the debtor or if such claims have been transferred to third parties. Whether a joining creditor is a party in interest has significantly more bearing on the legitimacy of the involuntary petition than whether a joining creditor holds a matured invoice.

Consequently, the petition date is the relevant date to assess whether a joining creditor holds a claim. Nevertheless, as discussed below, even if we construed the word "holding" as the bankruptcy court does, Fence Factory also held a claim as of the joinder date.

2. **Even if we use the bankruptcy court's construction of the word "holding," Fence Factory held a claim on the date it joined the petition.**

Although the bankruptcy court did not give much weight to the nature of the debt owed to Fence Factory, in this case, the ongoing and unmatured nature of the debt is crucial. In its order dismissing the

---

[11] We further discuss ongoing and unmatured debts in section A.2. below.

involuntary petition, the bankruptcy court evaluated only the invoice that was due on the petition date. However, the record indicates that Mr. King owed a continuing obligation to Fence Factory.

Even if we construe the word "holding" as the bankruptcy court did, i.e., as requiring joining creditors to hold a claim as of the joinder date, creditors owed an unmatured debt would qualify as joining creditors under § 303(c). This analysis requires a closer look not at the word "holding," but at the word "claim."

We need not guess what Congress meant by using the word "claim" because the Code defines it. Pursuant to § 101(5), a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, **unmatured**, disputed, undisputed, legal, equitable, secured, or unsecured." (Emphasis added).

"Congress intended by [the language in § 101(5)] to adopt the broadest available definition of 'claim.'" *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991) (citations omitted). In fact, the legislative history regarding the definition of the word "claim" explicitly says as much. H.R. REP. No. 95-595, at 309 (1977) ("By this broadest possible definition . . . the bill contemplates that all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case. It permits the broadest possible relief in the bankruptcy court.").

Thus, in interpreting § 303(c), we start by applying this "broadest available definition" of the word "claim." From there, we assess the explicit

limitations set forth by Congress that might serve to narrow this "broadest available definition" for purposes of § 303(c). First, although § 101(5) is clear that the word "claim" encompasses both secured and contingent claims, Congress explicitly limited the ability to join an involuntary petition to creditors holding unsecured and noncontingent claims. In addition, to the extent the explicit limitations of § 303(b)(1) also apply to creditors who join a petition under § 303(c),[12] the broad definition of "claim" would further be narrowed to exclude certain disputed claims.

Absent entirely from § 303, however, is any mention of unmatured claims. Although it can be difficult to distinguish between contingent and unmatured claims, and the Code does not define either term, several cases have drawn a distinction between contingent and unmatured claims.

In the Ninth Circuit, "[a] claim is contingent when the debtor will be called upon to pay it only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor." *Picerne Constr. Corp. v. Castellino Villas, A.K.F. LLC* (*In re Castellino Villas,*

---

[12] Section 303(c) does not explicitly state that only creditors with claims that are not the subject of a bona fide dispute may join a petition. Nevertheless, some courts have held that creditors who join a petition under § 303(c) also must qualify as petitioning creditors under § 303(b). *See In re Kujawa*, 112 B.R. 968, 970 (Bankr. E.D. Mo. 1990); *In re Braten*, 86 B.R. 340, 343 (Bankr. S.D.N.Y. 1988); *but see In re Blixseth*, 2013 Bankr. LEXIS 5807, *25-26 (Bankr. D. Nev. July 10, 2013) (noting that *Braten* and *Kujawa* predate the 2005 amendments to the Code and that Congress's lack of amendments to § 303(c) despite the existence of these authorities signals Congress's disagreement with *Braten* and *Kujawa*). We need not take a stance on this issue because Mr. King did not dispute Fence Factory's claim as to liability or amount.

*A.K.F. LLC)*, 836 F.3d 1028, 1033 (9th Cir. 2016) (cleaned up); *see also Chi. Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.)*, 156 F.3d 1005, 1008 (9th Cir. 1998) ("Claims are contingent as to liability when the debtor's duty to pay arises only upon the occurrence of a future event that was contemplated by the parties at the time of the contract's execution."). "The classic example is a wager between two parties; until the wagered-on event comes to pass, both have contingent liabilities in the amount of the bet." *Seko Inv. Inc.*, 156 F.3d at 1008. Rental obligations that arose from a prepetition agreement, for example, are not contingent. *In re Miller*, 489 B.R. 74, 86-87 (Bankr. E.D. Tenn. 2013); *see also* 2 COLLIER ON BANKRUPTCY, ¶ 303.10[1] (Alan N. Resnick and Henry J. Sommer, eds., 16th ed. 2024) (future rental payments are not contingent).

Unmatured claims, on the other hand, simply refer to obligations where "the right to payment exists from the outset, but the time of payment is deferred." *In re Lambert*, 43 B.R. 913, 923 (Bankr. D. Utah 1984). "The maturation occurs with the mere passage of time as the date of payment draws nearer. But no outside, future occurrence in the contemplation of the parties is necessary to trigger the underlying obligation to pay." *Id.*; *see also* CLAIM, BLACK'S LAW DICTIONARY (12th ed. 2024) (defining a "matured claim" as a "claim based on a debt that is due for payment").

In viewing debts of this type through this lens, the claim held by Fence Factory is not contingent.[13] Where the alleged debtor and creditor have an existing arrangement with set terms as of the petition date, and the obligation to pay a monthly fee is not triggered by the occurrence of any event other than the passing of time, the claim is not "contingent" under the definitions above. Rather, any monthly obligations that are not yet due are simply unmatured.

Such ongoing obligations also do not generate a separate claim based on each monthly invoice; instead, the monthly invoices are part and parcel of one prepetition claim. Thus, the "claim" held by a trade creditor like Fence Factory refers to the overall prepetition arrangement between the creditor and alleged debtor, with future monthly invoices constituting unmatured portions of a single claim.

Here, the bankruptcy court referred to Fence Factory's "claim" as the August 2022 invoice. However, that invoice represented only one installment of the matured portion of the continuing debt owed to Fence Factory. Thus, any monthly obligations incurred but not yet due at the time Fence Factory filed its joinder would simply be unmatured portions of the single prepetition claim held by Fence Factory. And, given Mr. King's continuous use of the fencing, some debt was always incurred but not yet

---

[13] Although the parties stipulated, and the bankruptcy court held, that Fence Factory's "claim" was noncontingent, both the parties and the bankruptcy court were referring only to the August 2022 invoice. The stipulation and the bankruptcy court's order are silent with respect to the nature of any postpetition rental obligations.

matured. Because § 303(c) does not explicitly restrict creditors holding unmatured claims from joining a petition, a creditor owed a continuing obligation at the time it joins a petition **presently** holds a claim, even if a particular invoice is not due at the time the creditor files its joinder.

For all the reasons stated above, we reverse the bankruptcy court's holding that Fence Factory did not qualify as a joining creditor for purposes of § 303(c).

As previously noted, Fence Factory filed a motion to withdraw its joinder, which Wolverine opposed. The bankruptcy court did not reach the issue of withdrawal because it disqualified Fence Factory as a petitioning creditor. On remand, the bankruptcy court should consider whether Fence Factory may withdraw its joinder.

## B.     Wolverine has not articulated how it was prejudiced by the bankruptcy court's procedures.

At various points in its briefing, Wolverine suggests that the bankruptcy court should have required that Mr. King file an answer before holding an evidentiary hearing on certain issues.

Where an appellant contends that the bankruptcy court's procedures were deficient, or that the court erred by failing to provide adequate notice and opportunity, the appellant must show prejudice from the procedural deficiencies. *Rosson v. Fitzgerald (In re Rosson)*, 545 F.3d 764, 776-77 (9th Cir. 2008), *partially overruled on other grounds by Law v. Siegel*, 571 U.S. 415 (2014), *as recognized by Nichols v. Marana Stockyard & Livestock Mkt., Inc. (In re*

*Nichols)*, 10 F.4th 956, 961 (9th Cir. 2021); see also *City Equities Anaheim, Ltd. v. Lincoln Plaza Dev. Co. (In re City Equities Anaheim, Ltd.)*, 22 F.3d 954, 959 (9th Cir. 1994) (rejecting due process claim for lack of prejudice where debtor could not show that any different or additional arguments would have been presented if procedural deficiency had not occurred).

Wolverine has not articulated any prejudice flowing from the bankruptcy court's procedures in this case. As highlighted above, before the bankruptcy court held an evidentiary hearing, the parties were able to conduct discovery, file pretrial evidentiary motions, complete a comprehensive pretrial stipulation and file motions in limine. In addition, the bankruptcy court held the evidentiary hearing over a year after Wolverine initiated the involuntary case. On these facts, and because Wolverine has not presented any facts demonstrating prejudice, there is no need to disturb the remainder of the bankruptcy court's order based on any procedural defect.

## CONCLUSION

Based on the foregoing, we REVERSE the portion of the bankruptcy court's order dismissing the petition that is inconsistent with this opinion and REMAND for the bankruptcy court to assess whether Fence Factory may withdraw its joinder.